UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRACEY O'NEIL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLOOMIN' BRANDS INC; OS RESTAURANT SERVICES, LLC; and OUTBACK STEAKHOUSE OF FLORIDA, LLC,<br><br>Defendants. | No. 22 C 4851<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiff Tracey O'Neil, a former manager and managing partner at Outback Steakhouse restaurants in Buffalo Grove and Skokie, Illinois, sued Defendants Bloomin' Brands, Inc. ("BBI"), OS Restaurant Services LLC ("OSRS"), and Outback Steakhouse of Florida, LLC ("OSF"), for allegedly paying her and similarly situated female employees less than their male colleagues in violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d). Since O'Neil filed her complaint, three other individuals, Stacey Carroll, Andrea Proxmire, and Bianca Viamantes, consented to become Plaintiffs in this case. Doc. 40-1 (Carrol consent form); Doc. 43-1 (Proxmire consent form); Doc. 57-1 (Viamantes consent form). O'Neil asks the Court to authorize notice of this litigation to similarly situated female employees to give them the opportunity to opt-in to this collective action under § 216(b) of the Fair Labor Standards Act ("FLSA"), approve her notice and consent forms, and equitably toll the statute of limitations from the date she filed her motion. The Court authorizes O'Neil to provide notice; orders the

1

parties to meet and confer to draft mutually agreeable notice and consent forms; and grants equitable tolling as of the date of this Opinion.

## BACKGROUND[1]

I. **Defendants' Structure and Operation**

BBI is a holding company that does not itself own or operate any restaurants or employ restaurant staff. Instead, it owns corporate subsidiaries that are either responsible for owning and operating BBI-brand restaurants, or are themselves holding companies for other subsidiaries that own and operate the restaurants. OSF is a holding company five levels below BBI and itself owns OSRS, which sits six levels below BBI. OSRS actually owns and operates four of BBI's chains in Illinois: Outback Steakhouse ("Outback"), Bonefish Grill ("Bonefish"), Carrabba's Italian Grill ("Carrabba's"), and Fleming's Prime Steakhouse & Wine Bar ("Fleming's"). Even though BBI does not operate its restaurants, it provides "Manager Hiring Guidelines" that set "Target Total Compensation (Base Pay)" ranges depending on a new manager's experience and geographic region. Doc. 55-1 at 2. BBI's logo is prominently stamped on the top of the guidelines.

OSRS employs Joint Venture Partners ("JVPs") to oversee individual brands within a specified geographic region. For example, in 2016 OSRS hired Devonte McClung to oversee Bonefish restaurants in Illinois, Michigan, Ohio, Tennessee, and Wisconsin, and it hired Jeremy Dishler in 2020 to oversee select Outback restaurants in Illinois and Wisconsin. OSRS empowers JVPs to set compensation for managing partners outside of the ranges BBI provides in

---

[1] If the Court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

its guidelines. Dishler's and McClung's understanding was that the "guidelines do not mandate any particular pay decision. Instead, the guidelines identify market pay ranges[.]" Doc. 67-3 at ¶ 7; *see* Doc. 67-4 at ¶ 6 (including the same language verbatim).

## II. Manager and Managing Partner Responsibilities

Managers at Defendants' restaurants are responsible for the day-to-day operations of their establishments. Duties include recruiting, training, and managing staff, maintaining safe and clean environments, and ensuring guest satisfaction. According to O'Neil's declaration, her duties as manager also included organizing routine maintenance and managing budgets. *See* Doc. 46-1 at 28.

Defendants' managing partners have additional duties. BBI expects them to ensure quality standards, maintain full staffing, lead employees with courage and generosity, foster a positive work environment, oversee administrative duties such as cash handling and safety documentation, and develop marketing plans. Managing partners make initial investments of $10,000 into their restaurants. BBI pays its managing partners an annual base salary and a variable profit incentive depending on whether their restaurant follows a "distributable cash flow" ("DCF") or "total controllable income" ("TCI") model. Under the DCF model, managing partners earn 10% of the restaurant's DCF for the prior fiscal month; under the TCI model, managing partners receive a reward based on the profitability of the restaurant over the previous fiscal quarter. According to Defendants, JVPs consider whether a restaurant follows the DCF or TCI models when setting managing partner base compensation.

Although Outback's managers and managing partners are separate positions with separate compensation structures, considerable overlap exists between the positions and their job descriptions, even across different titles. For example, Outback posted identical job descriptions

for roles including "Managing Partner" in Jackson, Michigan, "Restaurant Manager" in Carmel, Indiana, and "Senior Manager" in Grand Rapids, Michigan, in online job postings.

### III.   O'Neil's and Declarants' Backgrounds

O'Neil worked at Outback's Buffalo Grove location as a manager beginning in August 2019. Her JVP, Kevin Vo, hired her at a starting base salary of $55,000. She received a promotion to managing partner at Outback's Skokie location in March 2020, receiving a pay increase to $60,000. After she became a managing partner, O'Neil learned that her restaurant paid several female managers less than a male manager. She brought this information to her new JVP, Dishler, who disregarded it. In October 2020, O'Neil learned from a former managing partner at a Bonefish restaurant that two women who held managerial positions received less pay than a male in the same position. In January 2022, O'Neil learned that a male manager who had recently joined her restaurant was earning $75,000. O'Neil reported this to Dishler, who again ignored her. Later in 2022, O'Neil learned of two other males whom Outback promoted to managing partner and who received starting salaries of $70,000. After she learned of each managing partner's higher pay, O'Neil reported the information to Dishler, who ignored her. O'Neil's employment at Outback ended on June 30, 2022. While O'Neil worked at Outback, she received paychecks that OSRS held responsibility for issuing.

Carroll began working as a server for the Bonefish restaurant in Orland Park, Illinois, in August 2013. She received a promotion to Restaurant Manager in August 2016, which came with a pay increase to $35,000. She later received a raise to $54,000 due to Bonefish's decision to remove her salary incentives. Shortly after Carroll received her pay increase, she learned that Bonefish hired male managers with starting salaries of $60,000. Although Carroll's JVP, McClung, said that those managers had more experience, Carroll said that was false. Carroll

4

received a promotion to Culinary Manager in January 2017, and a 12% raise in May 2021 after McClung recognized that Carroll was underpaid. In October 2022, Carroll trained a male employee who earned $8,000 more in salary than she did. While Carroll worked at Bonefish, she received paychecks that OSRS held responsibility for issuing.

Bridget Dahm worked at Outback locations throughout Wisconsin and Illinois from 2002 – 2016 and 2019 – July 2022. When Dahm became a managing partner in 2019, she earned a base salary of $50,000. But Dahm knew of at least three male managing partners who earned a higher base salary than she did, and she supervised two male managers at a Brookfield, Wisconsin store who earned a higher base salary than she. Dahm further learned that most of the women in her area made a lower base salary than their male counterparts. When she complained to her JVP, Greg Michals, he gave her a $5,000 raise, which Dahm said did not cover the difference between her and the male managing partners. A Vice President at BBI later promised Dahm a further pay increase, which never materialized. Dahm left her position as managing partner in July 2022 due to the pay discrepancy.

Amanda Bentz worked as a manager at Outback locations in Skokie, Illinois, and Wisconsin between 2017 – 2022. Bentz identified at least two newly hired male managers who earned higher base salaries than she did. One earned $48,000, and the other earned $50,000, while Bentz was only earning $45,000. Bentz did not know of any male managers earning less than she did.

Proxime was a manager at Bonefish locations in Troy, Michigan, and Schaumburg, Illinois, from 2017 – 2022. She started at a salary of $50,000 and received a raise to $55,000 around 2020 or 2021. Her JVP, McClung, denied her a salary increase to $65,000 in the second quarter of 2021. Proxime learned that a new manager at the Troy location received a starting

5

salary of $70,000. Proxime left Bonefish in July 2022 because she felt she was being undercompensated relative to male managers.

## LEGAL STANDARD

The EPA forbids employers from paying employees of one sex less than employees of the other sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d). Under Section 216(b) of the FLSA, an employee may bring his or her claim "through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez v. City of Chi.*, 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b)). "If the plaintiffs are able to show that other potential plaintiffs are similarly situated, courts may conditionally certify the case as a collective action and allow the plaintiffs to send notice of the case to similarly situated employees who may then opt in as plaintiffs." *Williams v. Ests. of Hyde Park, LLC*, No. 19 C 2288, 2020 WL 1812386, at *2 (N.D. Ill. Apr. 9, 2020) (citation omitted).

District courts have "wide discretion" to manage collective actions. *Alvarez*, 605 F.3d at 449 (citing *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 171 (1989)). Courts in this District have adopted a two-step process to determine whether an FLSA lawsuit should proceed as a collective action. *See In re New Albertsons, Inc.*, No. 21-2577, 2021 WL 4028428, at *1–2 (7th Cir. Sept. 1, 2021) (declining to review the district court's order granting conditional certification where the district court used the two-step process "regularly used in the Northern District of Illinois"); *Williams*, 2020 WL 1812386, at *1 ("[C]ollective FLSA actions in this district generally proceed under a two-step process."). The first step—the only step relevant here—is conditional certification, which requires a plaintiff to make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or

6

plan that violated the law." *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003) (citation omitted) (internal quotation marks omitted). "The second stage in a collective proceeding comes after any opt-ins have appeared and discovery has been finished. Then the defendant is given an opportunity to move for decertification. At that stage, if requested to do so, the court makes a more rigorous examination of the facts relating to whether or not the case may appropriately continue as a collective action." *Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 856 (N.D. Ill. 2013). "[The first step] is not intended to definitively resolve the question of whether this case is appropriate for collective treatment, but rather to assess whether it is appropriate to provide court-approved notice, to others who may be similarly situated, of the opportunity to join the case." *Hunter v. WirelessPCS Chi. LLC*, No. 18 CV 980, 2022 WL 864533, at *4 (N.D. Ill. Mar. 23, 2022) (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013) ("The sole consequence of conditional certification is the sending of court-approved written notice to employees[.]")). "Although lenient, the conditional certification standard is not a mere formality." *Vazquez v. Ferrara Candy Co.*, No. 14 C 4233, 2016 WL 4417071, at *5 (N.D. Ill. Aug. 19, 2016) (citation omitted) (internal quotation marks omitted). The "modest factual showing" requires factual support outside of the complaint, such as in the form of an affidavit, declaration, or other support beyond a plaintiff's allegations. *Id.* The plaintiff must establish "an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the [EPA]." *Nicks v. Koch Meat Co.*, 265 F. Supp. 3d 841, 849 (N.D. Ill. 2017). If a plaintiff makes the required showing, the Court may allow the plaintiff to provide notice of the case to putative collective action plaintiffs. *Flores*, 289 F. Supp. 2d at 1045. Importantly, the "merits of a case are not decided at the first step, and the Court does not 'weigh

evidence, determine credibility, or specifically consider opposing evidence presented by a Defendant.'" *Hunter*, 2022 WL 864533, at *3 (quoting *Bergman*, 949 F. Supp. 2d at 855–56).[2]

Some courts have found that plaintiffs seeking preliminary certification face a higher evidentiary burden if they have already completed some discovery. *See, e.g.*, *Hunter*, 2022 WL 864533, at *3. Indeed, this "modest plus" standard is the yardstick against which Defendants urge the Court to measure O'Neil's evidence. But the Court is uncertain that "modest plus" significantly increases the difficulty O'Neil faces to obtain conditional certification at this stage. At most, it seems that "modest plus" means that the Court should "consider[] the evidence submitted both by Plaintiffs and Defendants, while remaining mindful of the fact that Defendants still have greater access to evidence at this stage than Plaintiffs." *Id.*; *see also id.* at *3 ("Under this 'intermediate' approach, both sides' evidentiary submissions are considered in determining whether there is a group of similarly situated employees who may be discovered by sending out an opt-in notice." (internal quotations omitted)). The Court adopts this standard.

## ANALYSIS

O'Neil's motion and Defendants' response present three issues. First, whether the Court should allow O'Neil to provide notice of this litigation to a conditionally certified collective class, and how the Court should define that class. Second, the form of the notice. Third, whether the Court should equitably toll the relevant statute of limitations. The Court addresses these issues in turn.

---

[2] The Defendants argue that two out-of-circuit cases, *Swales v. KLLM Transport Services, L.L.C.*, 985 F.3d 430 (5th Cir. 2021), and *Clark v. A&L Homecare & Training Center, LLC*, 68 F.4th 1003 (6th Cir. 2023), show that the "tide is shifting away from a two-stage approach to certification." Doc. 69 at 11. However, this claim ebbs in the absence of a Seventh Circuit case overruling the historic approach that courts in this District take to the question presented here.

I. Notice Authorization

First, O'Neil asks the Court to preliminarily certify a collective of "all women employed in Illinois in a managerial position (excluding assistant managers) by the Defendants within the three years prior to the Order granting this Motion." Doc. 46 at 7. In other words, O'Neil wants to proceed with a collective class of all female managers and managing partners who worked at Illinois locations of Outback, Bonefish, Carrabba's, and Fleming's restaurants. In support of this definition, O'Neil presents evidence of potential gender-based pay discrimination against other female managers and herself at the Skokie Outback location; evidence of the same kind of discrimination against other female managers at other Outback and Bonefish restaurants throughout Illinois; and evidence of at least some BBI and OSRS involvement in the operations of the Outback and Bonefish restaurants.

To show alleged discrimination at the Skokie Outback location, O'Neil swears in her affidavit that she personally witnessed alleged gender-based pay discrimination against multiple female managers when she was a managing partner through her access to salary data for her employees, and that the JVP overseeing her restaurant ignored her protests. O'Neil then states that she may have been the victim of such discrimination after she learned about two newly promoted managing partners who received higher base compensation than her, and that her JVP once again ignored her concerns about the pay disparity. In response, Defendants claim that O'Neil ignores differences in pay that result from Outback's DCF and TCI Managing Partner Compensation Plans, which undermines her claim that she faced pay discrimination. But O'Neil correctly rebuts this argument by noting that the EPA prohibits unequal "wage rates" and would therefore ignore bonus compensation that managing partners could receive for overseeing high-performing stores. Doc. 70 at 4 (quoting *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643,

655 (4th Cir. 2021)). In any event, whether O'Neil can actually prove that she faced wage discrimination is not at issue at this stage in the case. *Hunter*, 2022 WL 864533, at *3 (the "merits of a case are not decided at the first step"); *see also Larsen v. Clearchoice Mobility, Inc.*, No. 11 C 1701, 2011 WL 3047484, at *1 (N.D. Ill. July 25, 2011) ("[T]he court does not resolve factual disputes or decide substantive issues going to the merits.").

Next, O'Neil brings forward four affidavits from female managers who worked at different Outback and Bonefish locations within Illinois, each of whom claim that they faced gender-based pay discrimination. The declarants report their experiences and knowledge of alleged pay discrimination, and either indifference or attempted justification from the JVPs responsible for their restaurants. Although Defendants argue that "[a]llegations that individual supervisors violated the EPA do not suffice to support companywide collective treatment," Doc. 69 at 18 (citing *Hannah*, 2020 WL 2571898, at *7, and *Meadows v. NCR Corp.*, No. 16 C 6221, 2020 WL 1042042, at *6 (N.D. Ill. Mar. 4, 2020)), what the declarations do show is that the alleged discrimination O'Neil identified was not limited to her location or her JVP. The alleged discrimination was present across *several* OSRS locations and *several* JVPs. This is enough to broaden the scope of her collective action to include OSRS' other restaurants. *See Nicks*, 265 F. Supp. 3d at 852–53 (granting conditional certification across all of a defendant's locations when the plaintiff provided evidence of common policy concerning some locations).

Lastly, to tie her and the other declarants' experiences together with the rest of the restaurants under Defendants' supervision, O'Neil submits several documents showing that BBI and OSRS are involved with the operations of the restaurants they own within Illinois. O'Neil highlights compensation ranges that BBI established for its restaurants, which set forth minimum and maximum compensation amounts for restaurant managers across different geographies and

zones of experience. Defendants respond with a declaration of their own from their Senior Vice President of Human Resources, claiming that the pay ranges are not dispositive and that JVPs can make independent compensation decisions. Doc. 67-2 ¶ 17 ("A JVP may, but need not, consider BBI's 'Manager Hiring Guidelines.' The guidelines do not mandate any particular pay decision[.]"). They provide additional evidence through the affidavits of Dishler and McClung who report that BBI's guidelines do not control how they set compensation for managers or managing partners. *See* Doc. 67-3 ¶ 7 ("The guidelines do not mandate any particular pay decision. Instead, the guidelines identify market pay ranges[.]"); Doc. 67-4 ¶ 6 (repeating the same language verbatim). But even if JVPs are allowed to (and do) deviate from the guidelines, the guidelines still show that BBI exerts influence over its many restaurants. *See Soto v. Wings 'R US Romeoville, Inc.*, No. 15 C 10127, 2016 WL 4701444, at *8 (N.D. Ill. Sept. 8, 2016) ("[A]lthough Defendants have presented a modest factual showing of their own attempting to establish that they *did not* violate the law, that is insufficient to displace the testimony of the six declarants who say otherwise."). O'Neil then points to the presence of OSRS' name on her and Carroll's paychecks to provide an additional hook linking the operator of the four restaurant brands under OSRS' management with her claims. *See* Doc. 46-1 at 10 (O'Neil paystub showing Outback logo issued by OS Restaurant Services, LLC); *id.* at 13 (Carroll paystub showing Bonefish logo issued by OS Restaurant Services, LLC). Defendants do not specifically attack this evidence.

  O'Neil has also put forward evidence to show that she is sufficiently similarly situated with the proposed class to make preliminary certification appropriate. "Courts regularly find, however, that a potential class is similarly situated for purposes of conditional certification, where, as here, the plaintiff[] ha[s] provided multiple affidavits from workers from multiple

11

locations demonstrating that they perform similar duties." *Nicks*, 265 F. Supp. 3d at 854. As already noted, O'Neil submitted several affidavits from managers at different of Defendants' restaurants, and she further brings forward evidence of BBI job postings that show extensive overlap between the job duties of a "Managing Partner," "Restaurant Manager," and "Senior Manager" at locations in Illinois, Michigan, and Indiana. Doc. 46-1 at 52–71. These documents show that O'Neil at least arguably performed similar duties as a manager and a managing partner during her employment with Outback as other employees with those titles, satisfying her more lenient burden at the first step of the certification inquiry. *See, e.g.*, *Russell v. Ill. Bell. Tel. Co.*, 575 F. Supp. 2d 930, 937–38 (N.D. Ill. 2008) (finding potential plaintiffs were similarly situated where they provided affidavits indicating that they worked at different call centers with different supervisors but all had primary responsibility of receiving calls and selling defendant's equipment); *see also Nicks*, 265 F. Supp. 3d at 855 ("[C]ourts typically delay consideration of disparate factual and employment settings of individual class members until the second stage of certification analysis." (alterations omitted) (citation omitted) (internal quotation marks omitted)).

Considering O'Neil's and Defendants' evidence together, the Court finds that O'Neil has satisfied her relatively low burden at this stage and approves O'Neil's proposed collective definition. In spite of Defendants' contentions, O'Neil's evidence shows that she plausibly suffered from gender-based pay discrimination at two Outback restaurants under the management of two different JVPs; that other female managers plausibly faced similar pay discrimination at other, unique Outback and Bonefish restaurant locations; and that BBI and OSRS have at least some role in the operation of all of their restaurant chains. This is enough to satisfy O'Neil's "modest plus" burden at the first step of the collective certification stage. *See,*

*e.g.*, *Grosscup v. KPW Mgmt., Inc.*, 261 F. Supp. 3d 867, 877 (N.D. Ill. 2017) (granting collective certification across all Illinois and Maryland Buffalo Wild Wings locations based on five declarations and documentary evidence from defendant); *Nicks*, 265 F. Supp. 3d at 852–53 (granting conditional certification across all defendant's locations when plaintiff provided evidence of common policy concerning some locations); *Pieksma v. Bridgeview Bank Mortg. Co.*, No. 15 C 7312, 2016 WL 7409909, at *6 (N.D. Ill. Dec. 22, 2016) (same); *Smith v. C.H. James Rest. Holdings, LLC*, No. 11 C 5545, 2012 WL 1144617, at *4 (N.D. Ill. Apr. 5, 2012) (granting conditional certification when plaintiff submitted limited evidence, including affidavit, in support of motion); *see also Hunter*, 2022 WL 864533, at *4 (granting limited conditional certification when evidence only supported collective definition encompassing plaintiff's employment location).

The Court finds that O'Neil has met her "modest plus" burden and conditionally certifies her requested collective action. The Court preliminarily defines the collective as follows: all women whom Defendants employed in Illinois as a manager and/or managing partner (excluding assistant managers) within the three years prior to the date of this Opinion.

**II.     O'Neil's Proposed Notice Plan**

Next, O'Neil proposes draft "Notice" and "Consent" forms for the Court's approval. O'Neil also proposes a plan for informing potential opt-in plaintiffs of this litigation and giving them the opportunity to join it. The Court addresses these in turn.

The Court rejects O'Neil's proposed forms—without prejudice—and orders the parties to meet and confer to create jointly amenable forms. Defendants list several purported deficiencies with O'Neil's drafts, including her characterization of the parties' respective positions, her omission of defense counsels' identity and contact information, and her use of case-caption

letterhead instead of using her firm's letterhead. *See* Doc. 69 at 21–22. In her reply, O'Neil agrees to restate Defendants' position and identify their counsel, but she asserts that no other changes are necessary. *See* Doc. 70 at 13–14.

As the Court's standing order on motion practice indicates, the Court places a premium on interparty engagement to hammer out disputes, whether big or small, before the Court adjudicates them. *See* Judge Sara L. Ellis, *Motion Practice*, Northern District of Illinois (last accessed Dec. 19, 2023) ("**[T]he Court will apply the meet and confer requirement not just to discovery motions, but to all motions that a party wishes to file.** The instructions concerning what must be done to comply with the discovery meet and confer requirement will be applied with equal force to all other motions."), https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==. Although the parties reportedly conferred with respect to this motion in a broad sense, *see* Doc. 46 at 14 ("Defendants have indicated that they oppose this Motion."), the briefing indicates that they did not discuss crafting a notice that would satisfy both camps, *see* Doc. 69 at 22 ("Defendants respectfully request that the Court . . . order the parties to meet and confer regarding [the notice's] content."). Given the Court's longstanding position on the benefits of meet and confers on the litigation process and conservation of judicial resources, it orders the parties to draft a joint proposed notice by January 17, 2024. If the parties remain at an impasse after the meet and confer process, then the parties must each submit a proposed notice by January 16, 2024, and the Court will select the notice that it will allow O'Neil to send.

This brings the Court to O'Neil's proposed notice plan. She "seeks the production, within fourteen (14) days and in Excel format, of the names, last known addresses, and last known email addresses of all . . . women who were employed in Illinois as a Manager and/or Managing Partners for the Defendants at any time within the last three (3) years." Doc. 46 at 14.

O'Neil asks the Court to authorize both email and mail notice, as well as a sixty-day grace period from when she sends the notice to allow its recipients ample time to return them. Defendants argue that O'Neil should not be allowed to email the notice due to "concerns about misleading notification through modification or additional commentary" and asks the Court to bar repeated notices. Doc. 69 at 22.

In the exercise of its "wide discretion" to manage collective actions, the Court will adopt O'Neil's notice plan with slight modification. *Alvarez*, 605 F.3d at 449. The Court orders Defendants to provide O'Neil in Excel format a list of the names, last known addresses, and last known email addresses of all women whom Defendants employed in Illinois as a manager and/or managing partner (excluding assistant managers) within the last three years prior to the date of this Opinion. The Court authorizes O'Neil to provide identical, simultaneous email and mail notice to the potential collective members.³ In order to alleviate Defendants' concerns, the Court orders O'Neil to send her email notice through a single mass email to all potential collective members with Defendants' counsel blind carbon copied (or some other means that complies with the obvious intent of this provision). The Court grants O'Neil's request for a sixty-day period for potential collective members to return their consent forms.

### III. Equitable Tolling

Finally, O'Neil requests that the Court toll the statute of limitations because of the intervening delay between the date she filed her motion, June 5, 2023, and the date that this Court issued its ruling. Defendants argue that the fact that some additional plaintiffs have already opted in, including during the period between the filing of the motion and this ruling, shows that no tolling is necessary. Further, Defendants argue that "the time necessary to brief

---

³ For the avoidance of doubt, the Court intends for O'Neil to place the physical copies of the notice in the mail on the same date that she emails the notice to the potential collective members.

and decide Plaintiff's motion is neither extraordinary nor a reason why others could not opt in." Doc. 69 at 21.

"[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (alteration omitted) (citation omitted) (internal quotation marks omitted). The question of whether courts should consider the delay between a plaintiff's request for conditional certification and the court's grant of conditional certification as an "extraordinary circumstance" is context dependent. As the *Hunter* court stated:

> Some courts consider a delay in issuing a ruling on a conditional certification motion "an extraordinary circumstance that should not cause the opt-ins to lose out on the potential benefits" of a collective action lawsuit. *See Bergman*, 949 F. Supp. 2d at 860–61. Other courts disagree, however, reasoning that the passage of several months from motion to determination is a predictable and common result of busy dockets. *See, e.g.*, *Sylvester v. Wintrust Fin. Corp.*, No. 12 C 01899, 2014 WL 10416989, at *2 (N.D. Ill. Sept. 26, 2014). Still other courts question the ability to assess the diligence of potential plaintiffs in advance of their opting into the case. *See Calloway v. AT & T Corp.*, 419 F. Supp. 3d 1031, 1037 (N.D. Ill. 2019) (denying plaintiffs' motion to equitably toll FLSA claims prior to conditional certification without prejudice to individual opt-in plaintiffs' subsequent renewal).

2022 WL 864533, at *12.

However, a closer reading of *Bergman*, which the *Hunter* court cites to support the notion that the intervening period between motion and ruling may constitute an extraordinary circumstance, shows that the events of this case do not warrant a similar finding. In *Bergman*, briefing on the plaintiff's motion to certify a conditional collective action closed on June 30, 2011. Though the *Bergman* court acknowledged that "[i]n the usual course, a ruling would have

16

occurred shortly thereafter," nearly two years passed before the court issued its decision. 949 F. Supp. 2d at 860. The court held that its "long delay in issuing a ruling [was] an extraordinary circumstance that should not cause the opt-ins to lose out on the potential benefits of this lawsuit." *Id.* Here, O'Neil filed her reply brief on July 28, 2023. *See* Doc. 70. As of today, not even five months have elapsed before this Court's ruling. This cannot constitute "an extraordinary circumstance" without the Court necessarily agreeing "that equitable tolling should be granted in every Section 216(b) case as a matter of course during the pendency of a conditional class certification request, thereby transforming this extraordinary remedy into a routine, automatic one." *Sylvester*, 2014 WL 10416989, at *2. Because the Court declines to find that the ordinary lapse of time between briefing and ruling constitutes an extraordinary circumstance, it denies O'Neil's motion to equitably toll the statute of limitations as of the date she filed her motion.

However, the Court will equitably toll the statute of limitations as of the date of this Opinion. This is because the Court is imposing a delay between its decision to authorize O'Neil's notice and the date that she can send the notice to potential collective members to allow the parties to reach a mutually agreeable notice form. To assess whether equitable tolling is appropriate in this situation, the Court examines:

> (1) whether the extraordinary circumstances were beyond the control of the plaintiff or the putative collective members;
> (2) whether refusal to toll the statute of limitations would result in hardship for the putative collective members; and (3) whether tolling prejudices the defendant.

*Hunter*, 2022 WL 864533, at *12 (citing *Lucas v. JJ's of Macomb, Inc.*, 321 F. Supp. 3d 882, 886–87 (C.D. Ill. 2018)). The first element, the Court's imposition of a delay, tilts slightly in favor of equitable tolling. The delay was partially but not entirely within O'Neil's (and

17

Defendants') control—on the one hand, they could have jointly worked to create a notice form that both sides would accept before O'Neil filed her motion; on the other hand, the Court could have accepted her notice form or ordered modifications without mandating that the parties take additional meet and confer measures. The second element, hardship to putative collective members, tilts in favor of equitable tolling because a potential opt-in plaintiff's claims could expire between now and when the parties reach agreement on the notice form. *See Yahraes v. Rest. Assocs. Events Corp.*, No. 10 C 935, 2011 WL 844963, at *2 (E.D.N.Y. Mar. 8, 2011) (granting equitable tolling of FLSA claims in part due to court-imposed stay). On the other hand, Defendants will not be unfairly prejudiced because O'Neil's complaint included collective allegations when she first filed it at the inception of this case. *See Lucas*, 321 F. Supp. 3d at 888 ("Tolling will not unfairly prejudice Defendant[s] because Defendant[s were] able to know the potential scope of [their] liability when the [] Complaint was filed."). With the first element neutral and the second and third elements counseling in favor of equitable tolling, the test indicates that the Court should grant limited equitable tolling of the statute of limitations as of the date of this Opinion. *See id.*; *Hunter*, 2022 WL 864533, at *13 (granting plaintiffs modified relief based on overbroad request for equitable tolling).

## CONCLUSION

The Court grants in part and denies in part O'Neil's motion to authorize notice [46]. The Court will allow O'Neil to send notice to all women whom the Defendants employed in Illinois as a manager and/or managing partner (excluding assistant managers) within the last three years prior to the date of this Opinion in accordance with the procedure this Opinion outlines. The Court orders the parties to meet and confer to create the notice form and submit it for the Court's approval by January 15, 2024. If the parties cannot agree on a notice form, then they must each

submit a proposed notice by January 15, 2024, from which the Court will select. The Court tolls the statute of limitations for potential collective class members as of December 19, 2023. The Court sets a status date for January 17, 2024 at 9:30 a.m.

Dated: December 19, 2023

SARA L. ELLIS
United States District Judge